**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**KRISTY A. EDWARDS,**

      **Plaintiff,**

**vs.**                           **Case No. 4:18cv415-WS/CAS**

**NANCY A. BERRYHILL,
Acting Commissioner of Social
Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to N.D. Fla. Loc. Rule 72.2(D); 28 U.S.C. § 636(b).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's Title II application for period of disability and Disability Insurance Benefits (DIB).   After careful consideration of the entire record, the decision of the Commissioner should be reversed and remanded for further consideration.

## I. Procedural History and Testimony

On June 11, 2015, Plaintiff, Kristy A. Edwards, applied for DIB benefits with an alleged onset date of June 19, 2011, alleging disability based on depression, back injury, arthritis, and learning problems.   Tr. 16, 203, 206.[1]   Plaintiff's last date insured for DIB was December 31, 2016. Tr. 16, 203.   Plaintiff's application was denied initially on September 15, 2015, and upon reconsideration on December 7, 2015.   Tr. 16, 83-114.

Plaintiff requested a hearing on January 22, 2016.   Tr. 16 127-28. On May 6, 2017, Plaintiff's counsel filed a representative brief. Tr. 295-307.   On May 17, 2017, Administrative Law Judge (ALJ) David Herman, conducted a hearing in Thomasville, Georgia, where Plaintiff appeared and testified.   Tr. 16, 51-77.   Dr. John Black, an impartial vocational expert, testified.   Tr. 16, 53, 70-75, 288-90 (Resume).   Plaintiff was represented by Joseph Thomas McGraw, an attorney.   Tr. 16, 53, 117-19.

---

[1] Citations to the transcript/administrative record, ECF No. 11, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner of each page.   Plaintiff raised additional grounds throughout the review process.   *See, e.g.*, Tr. 22.

Case No. 4:18cv415-WS/CAS

On September 6, 2017, the ALJ entered a decision concluding that Plaintiff was not disabled.   Tr. 16-32.   Plaintiff filed a request for review of the ALJ's decision, and on October 15, 2017, Plaintiff's counsel filed a two-page letter/brief with the Appeals Council.   Tr. 175-76, 308-12.

On July 6, 2018, the Appeals Council denied Plaintiff's request for review, having reviewed the request for review and additional evidence consisting of "[r]epresentative contentions dated October 15, 2017," Tr. 308-12, and medical records from Archbold Primary Care, dated November 13, 2017, Colquitt Regional Anesthesia dated February 15, 2017, to July 18, 2017, Archbold Primary Care dated June 12, 2017, and Archbold Medical Center dated June 16, 2017, Tr. 8-12, 40-50, 78-82. Tr. 1-7.   The Appeals Council noted that the ALJ "decided [Plaintiff's] case through December 31, 2016," and "[t]his additional evidence does not relate to the period at issue," concluding that "[t]herefore it does not affect the decision about whether [Plaintiff was] disabled beginning on or before December 31, 2016."   Tr. 2.   Plaintiff was directed to file another application if she wanted consideration regarding whether she was disabled *after* December 31, 2016.   *Id.*   The ALJ's decision stands as the final decision of the Commissioner.   *See* 20 C.F.R. § 404.981.

On September 4, 2018, Plaintiff filed a Complaint requesting judicial review of the Commissioner's final decision.   ECF No. 1.   Plaintiff filed a memorandum of law, ECF No. 15, followed by the Commissioner's memorandum of law, ECF No. 16, which have been considered.

## A. The Hearing

At the hearing held on May 17, 2017, Plaintiff testified that she currently weighed 346 or 336 pounds and was 5 '5" tall.   Tr. 55.   She testified that she had gained 40 or 50 pounds in the past six months to a year.   *Id.*   She attributed the weight gain to her inability to do what she used to do physically.   *Id.*   She has a young daughter who lives with her and her husband.   Tr. 56.   Her mother also lives with her.   *Id.*   Plaintiff believes she only finished sixth grade, although she was promoted to eighth grade.   *Id.*   She testified that she dropped out because it was hard for her.   Tr. 57.   She previously worked as a server, host, and cashier for several different restaurant chains.   Tr. 59.

When asked to explain why she feels that she cannot work, Plaintiff testified that she has difficulty dealing with people, loses patience, and says things that she should not say.   Tr. 61.   She testified that she also is in pain from physical problems and also experiences a racing heart, sweating,

and full panic attacks.  *Id.*  She said these anxiety problems began around 2011 but she was not sure what triggered them.  Tr. 62.  She has been on medication for depression and anxiety on and off for seven years.  *Id.*

Plaintiff described her pain in her back and radiating down her left leg.  Tr. 63.  She testified she has a pinched nerve root in her back.  *Id.* She tries to do exercises in her home three times a week and takes hydrocodone three times a day.  Tr. 63-64.  She also takes Meloxicam and gabapentin.  Tr. 64.  She said she has migraines two to three times a week, which usually last all day and sometimes into the next day.  *Id.* She testified she was sometimes absent at her job two to three times a week.  Tr. 64-65.  She does not use a back brace or a cane.  Tr. 65.

Plaintiff testified that she used to use marijuana but stopped about six years ago.  Tr. 66.  She said she spends her days sitting or lying down, sometimes playing games with her daughter, doing jigsaw puzzles, looking at Facebook or Google for two or three hours a day, and dozing on and off. Tr. 66-67.  She testified that she does not bathe her daughter, help her dress, cook, clean, do chores, grocery shop, or go to church or outside activities.  Tr. 67-68.  She testified she has trouble using her hands and fingers due to tendinitis in her wrist.  Tr. 69.

Impartial vocational expert John Black, Ed. D., testified based on a
hypothetical question assuming a job involving light work, occasional
climbing of stairs, never climbing ladders, ropes or scaffolds, occasional
stooping, kneeling and crouching, but never crawling, limited to routine
tasks and simple work-related decisions, frequent contact with supervisors,
coworkers and the public.   Tr. at 72.   Dr. Black testified that a person with
Plaintiff's age, limited education, and experience could not perform work as
an informal waitress.   *Id.*   Dr. Black testified that the person could perform
other work in the national economy including parking lot cashier, routing
clerk, and remnant sorter.[2]   Tr. 73.   A second hypothetical was presented
which included the limitations in the first hypothetical but reduced the
exertional level from light to sedentary and increased the restrictions on
social contact from frequent to occasional with supervisors, coworkers, and
the public.   Tr. 73.   Dr. Black testified that the person could work as a
document preparer, surveillance system monitor, and telephone order

---

[2] Parking Lot Cashier, DOT# 211.462-010, light exertional level, SVP of 2,
unskilled, with 43,000 positions nationally; Routing Clerk, DOT# 222.687-022, light, SVP
of 2 with 44,000 such positions nationally; and Remnant Sorter, DOT# 789.687-146,
light, SVP of 2 with 30,000 such positions nationally.   Tr. 73.

clerk,[3] however if the person were absent two days a month on an unscheduled basis or were off task 15% of the workday in addition to normal breaks, they would not be able to perform work in the national economy.   Tr. 73-74.   In response to a question by Plaintiff's counsel, Dr. Black testified that if the person were also limited to only occasional reaching, handling, fingering, feeling, and pushing with the upper extremities, that would preclude the jobs identified.   Tr. 75.   The ALJ noted that the medical record did not mention tendinitis, but concluded that a nerve conduction test by Dr. Kayas (Ex. 14F) showed Plaintiff had early mild carpal tunnel syndrome on the right.   Tr. 75-76.

## B.  Findings of the ALJ

After the evidentiary hearing and after a review of the medical record, ALJ David Herman made several findings in the decision issued on September 6, 2017:

1. "The claimant last met the insured status requirements of the Social Security Act on December 31, 2016."   Tr. 18.

---

[3] Document Preparer, DOT# 249.587-018, sedentary, SVP of 2, unskilled, for which there are 46,000 such positions; Surveillance System Monitory, DOT# 379.367-010, sedentary, SVP of 2, unskilled, for which there are 64,000 jobs nationally; Telephone order Clerk, DOT# 209.567-014, sedentary, SVP of 2, unskilled, for which there are 41,000 jobs nationally.   Tr. 74.

2.  "The claimant did not engage in substantial gainful activity [SGA] during the period from her alleged onset date of June 19, 2011[,] through her date last insured of December 31, 2016."   *Id.*

3.  "Through the date last insured, the claimant had the following severe impairments: morbid obesity, degenerative disc disease of the lumbar and thoracic spine, thoracic scoliosis, essential hypertension, migraine with aura, not intractable, neuropathy, borderline personality disorder, borderline intellectual functioning, affective disorder variously diagnosed as major depressive disorder and mood disorder, and anxiety disorder variously diagnosed as generalized anxiety disorder and panic disorder with agoraphobia."[4]   *Id.*

    The ALJ also considered Plaintiff's history of nocturnal hypoxemia, carpal tunnel syndrome, and cannabis abuse, but found these impairments are non-severe.   Tr. 18-19.   The ALJ also considered Plaintiff's allegations of parestheisas, sleep apnea, and a thoracic spine fracture and determined they were not medically determinable impairments.   Tr. 19.

4.  "To the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   Tr. 19.   The ALJ considered the severity of Plaintiff's mental impairments and determined that they singly and in combination, do not meet or medically equal the criteria of Listings 12.02, 12.04, and 12.06.   *Id.*   The ALJ considered the "paragraph B" criteria and determined that Plaintiff had *moderate* limitation in understanding, remembering, or applying information; *moderate* limitation in interacting with others; *moderate* limitation regarding concentrating, persisting, or maintaining pace; and

---

[4] The ALJ is not required to identify all impairments that should be considered severe.   See Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished); *see also* Mariarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).

*moderate* limitation for adapting or managing oneself.    Tr. 19-20.
The ALJ also determined the evidence did not establish the
presence of the "paragraph C" criteria.    Tr. 21.    The ALJ
specifically stated that the "paragraph B" criteria are not a residual
functional capacity [RFC] assessment, but are used to rate the
severity of mental impairments at steps 2 and 3 of the sequential
evaluation process.    *Id.*    The ALJ also noted that the mental RFC
assessment used at steps 4 and 5 requires a more detailed
assessment.    *Id.*

5.    "[T]hrough the date last insured, the claimant has the [RFC] to
perform light work as defined in 20 CFR 404.1567(b) except that
she can occasionally stoop, kneel, crouch, and climb ramps and
stairs.    She can never crawl or climb ladders, ropes, or scaffolds.
She is limited to performing simple, routine tasks and making
simple work-related decisions.    She can have weekly contact
with coworkers, supervisors, and the public."    Tr. 21; *see* Tr. 72-
73 (hypothetical posed to vocational expert).

6.    The claimant is unable to perform any past relevant work as an
informal waitress, light exertion, with an SVP of 3.    Tr. 30; *see*
Tr. 72-73.

7.    The claimant was 33 years old, which is defined as a younger
individual age 18-49, on the date last insured.    Tr. 30.

8.    The claimant has a limited education having attended school until
the seventh or eighth grades, Tr. 22, 56, 90, 207, 743, and is able
to communicate in English.    *Id.*    (Plaintiff was unable to pass the
GED due to problems with math and reading.    Tr. 488, 744.)
Transferability of jobs is not material to the determination of
disability because using the Medical-Vocational Rules (the Grids)
as a framework supports a finding that Plaintiff is not disabled
whether or not Plaintiff has transferable skills.    Tr. 31.

9.    "Through the date last insured, the claimant's age, education,
work experience, and [RFC], there were jobs that existed in

significant numbers in the national economy that the claimant could have performed." Tr. 31.   The ALJ determined that if the Plaintiff "had the [RFC] to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.18."   *Id.*   The ALJ determined that Plaintiff's ability to perform all or substantially all the requirements of a full range of light work has been impeded by additional limitations.   As a result, the vocational expert was asked whether jobs exist in the national economy which Plaintiff can perform.   The vocational expert testified that Plaintiff can perform several representative jobs including parking lot cashier, routing clerk, and remnant sorter, light exertional jobs with SVP's of 2.[5]   Tr. 31-32; *see* Tr. 73 (vocational expert opinion regarding available representative jobs).

10. "The claimant has not been under a disability, as defined in the Social Security Act, from June 19, 2011, the alleged onset date, through December 31, 2016, the date last insured."   Tr. 32.

---

[5] *See* note 2, *supra.*   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   A Specific Vocational Preparation (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."   Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   *Id.*   Unskilled work corresponds to an SVP of 1 and 2.   SSR 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).   Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.   SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).   In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."   20 C.F.R. § 404.1567(b).

## II. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[6]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings;

---

[6] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported

(2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history."  Bloodsworth, 703 F.2d at 1240 (citations omitted).   A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).   Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is

---

by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."   Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

entitled to DIB if she is under a disability prior to the expiration of her

insured status.   *See* 42 U.S.C. § 423(a)(1)(A); <u>Moore v. Barnhart</u>, 405 F.3d

at 1211; <u>Torres v. Sec'y of Health & Human Servs.</u>, 845 F.2d 1136, 1137-

38 (1st Cir. 1988); <u>Cruz Rivera v. Sec'y of Health & Human Servs.</u>, 818

F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

§ 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity [SGA]?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal the criteria listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[7]

5. Do the individual's impairments prevent other work?

---

[7] An RFC is the most a claimant can still do despite limitations.   20 C.F.R. § 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c); *see* <u>Cooper v. Astrue</u>, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor").

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.

20 C.F.R. § 404.1527.[8]   When considering medical opinions, the following

factors apply for determining the weight to give to any medical opinion:

(1) the frequency of examination and the length, nature, extent of the

treatment relationship; (2) the evidence in support of the opinion, such as

"[t]he more a medical source presents relevant evidence to support an

opinion, particularly medical signs and laboratory findings, the more weight"

that opinion is given; (3) the opinion's consistency with the record as a

whole; (4) whether the opinion is from a specialist and, if it is, it will be

accorded greater weight; and (5) other relevant but unspecified factors.   20

C.F.R. § 404.1527(b) & (c).

Pain is subjectively experienced by the claimant, but that does not

mean that only a mental health professional may express an opinion as to

the effects of pain.   To establish a disability based on testimony of pain

and other symptoms, the claimant must satisfy two parts of a three-part test

showing: (1) evidence of an underlying medical condition; and (2) either

(a) objective medical evidence confirming the severity of the alleged pain;

---

[8] This provision applies to claims filed before March 27, 2017.   For claims filed after that date, section 404.1520c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.   Wilson, 284 F.3d at 1225.   This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.   A clearly articulated credibility finding supported by substantial evidence will not be disturbed.   Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995).

To analyze a claimant's subjective complaints, the ALJ considers the entire record, including the medical records; third-party and the claimant's statements; the claimant's daily activities; the duration, frequency, intensity of pain or other subjective complaint; the dosage, effectiveness, and side effects of medication; precipitating or aggravating factors; and functional restrictions.   See 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects). The Eleventh Circuit has stated that "credibility determinations are the province of the ALJ."   Moore, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

A claimant bears the burden of proving he or she is disabled, and consequently, is responsible for producing evidence in support of the claim. *See* 20 C.F.R. § 404.1512(a); <u>Moore</u>, 405 F.3d at 1211.

## III. Analysis

Plaintiff raises two main issues: whether the ALJ properly considered the medical opinion evidence, both physical and mental, in determining the appropriate RFC; and whether the ALJ properly considered how Plaintiff's morbid obesity in combination with her other impairments affects her ability to function.   ECF No. 15 at 6, 18.   Plaintiff argues that the ALJ erred when he gave great weight to the Social Security Administration (SSA) reviewers' opinions that were based on "limited and inaccurate daily activities" and incomplete medical records, and when he "failed to consider the opinions' consistency with each other and the objective evidence."   ECF No. 15 at 6.   Plaintiff also argues that the ALJ erred in giving only little weight to the opinions of Dr. Nicodemo Macri and Dr. Kimberly Pickens citing, in pertinent part, Plaintiff's self-reported activities of daily living and inconsistency with the medical record.   ECF No. 15 at 17-18.   In addition, Plaintiff contends that the ALJ provided an incomplete obesity evaluation because he "never explained or evaluated how [Plaintiff's] morbid obesity

exacerbates her back pain and mental impairments and found her pain less severe because she failed to lose weight."   ECF No. 15 at 18.

### A. ALJ's Consideration of Medical Opinion Evidence in Determining Residual Functional Capacity

### 1. Physical Limitations Resulting from Severe Impairments

It is not in dispute that Plaintiff has severe physical impairments, including degenerative disc disease of the lumbar and thoracic spine, thoracic scoliosis, neuropathy, essential hypertension, and morbid obesity. Tr. 18.   In dispute is the validity of the ALJ's conclusion that despite Plaintiff's severe physical impairments, she can still do full-time, light, work, which the ALJ reached by giving little weight to Plaintiff's treating and examining physicians—Dr. Kimberly Pickens and Dr. Nicodemo Macri—and great weight to the Agency reviewing physician—Dr. Ronald Kline. Tr. 28-30.   In giving little weight to the opinions of Dr. Pickens and Dr. Macri, the ALJ cited, in part, Plaintiff's "self-reported activities of daily living over the course of her claim, including driving, shopping, self-care, household chores, cooking, and caring for a young child."   Tr. 30.

The ALJ concluded that Plaintiff can take care of her daughter, care for pets, prepare meals, drive, shop, pay bills, do puzzles, use the

computer and her cell phone.   Tr. 20 (citing Tr. 226-41; 256-63).   The ALJ

also concluded that Plaintiff "denied any problems performing her activities

of daily living."   Tr. 24 (citing Tr. 489-90).   The ALJ described Plaintiff as

having "good activities of daily living, including caring for a young child,

shopping, handling finances, cooking, and driving" as detracting from

Plaintiff's statements as to functional limitations and concluded that her

statements are "not entirely consistent with the medical record."   Tr. 27.

The records cited by the ALJ pertaining to Plaintiff's daily living show

that Plaintiff reported her daughter often feeds and waters the pets (Tr.

226); Plaintiff's mother often sends her meals already cooked and Plaintiff

can reheat leftovers and make a sandwich, but her preparation ability

depends on how much pain she is having (Tr. 227); she can only sit for a

short time due to pain (Tr. 226); she must keep moving and changing

position (Tr. 232); she needs help cleaning (Tr, 227); her pain makes

picking up her child difficult (Tr. 232); her pain impairs her driving or sitting

for more than 10-15 minutes (*Id.*); her legs and feet go numb (*Id.*); she

shops about once a month for food and sometimes for other items

(Tr. 229); after shopping she must go home and lie down (Tr. 230); she is

hardly able to clean herself or her house (Tr. 232.); Plaintiff's mother

reported Plaintiff is not able to do housework (Tr. 235); her mother helps her with household chores (Tr. 290); Plaintiff tries to do housework but must take breaks every breaks every few minutes (Tr. 490); she has help caring for the pets (*Id.*); her mother contributes to the cooking (*Id.*); her boyfriends does all the outside work (*Id.*); her constant back pain is aggravated by daily activities (Tr. 537, 677).

The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.   Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); *see also* 20 C.F.R. § 404.1529(c)(3)(i).   However, "participation in everyday activities of short duration, such as housework" does not disqualify a claimant from disability and is not necessarily inconsistent with the limitations recommended by the applicant's treating physicians.   Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997).

The Eleventh Circuit has explained that even working two days a week for seven hours each day, having the stamina to cook simple meals and drive short distances does not constitute sufficient evidence to discredit the claimant's claims that she is not able to perform light work on a regular and continuing basis.   Martz v. Comm'r, Soc. Sec. Admin., 649

F. App'x 948, 961 (11th Cir. 2016) (unpublished).   *See also* <u>Cavarra v. Astrue</u>, 393 F. App'x 612, 615-16 (11th Cir. 2010) (noting that performance of basic household chores with difficulty and with help from others does not provide substantial evidence to discount limiting effects of pain).

"[W]hen evaluating a claimant's functional capacity, the ALJ considers the claimant's ability to do sustained work-related activities on a regular and continuing basis, which means 8 hours per day, for 5 days per week.   As noted, light work requires standing or walking, on and off, for approximately six hours out of an eight-hour day."   <u>Martz</u>, 649 F. App'x   at 961 (citing 20 C.F.R. § 404.1567(b); Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983); Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)).   *See also* <u>Foote</u>, 67 F.3d at 1561 (explaining that substantial evidence did not support the ALJ's discrediting of claimant's testimony that her pain was so disabling as to affect her residual functional capacity because, although she testified that she was able to do some daily activities, she also testified that she was unable to do other daily activities); <u>Easter v. Bowen</u>, 867 F.2d 1128, 1130 (8th Cir. 1989) ("[A]n applicant need not be completely bedridden or unable to perform any household chores to be considered disabled."); <u>Bennett v.</u>

<u>Barnhart</u>, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003) ("It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances.").

The ALJ's reliance on Plaintiff's self-reported activities of daily living, which did not fully reflect Plaintiff's reports of her daily activities, does not support the ALJ's assessment of Plaintiff's subjective complaints or the little weight given to the opinions of Dr. Pickens and Dr. Macri.   Nor does the ALJ's reliance on daily activities support the great weight given the opinion of the Agency reviewer Dr. Kline or the rejection of Plaintiff's testimony of her functional limitations precluding her from working full time, eight hours a day, on a continuing basis.   Moreover, the medical records of Plaintiff's treating physicians also do not support the conclusion that Plaintiff has little difficulty in her daily activities, or in standing and walking up to six hours per day, due to her impairments.

Plaintiff's history of back pain began after an automobile accident in 2005.   Tr. 324.   On June 10, 2015, an MRI report noted mild or early degenerative disc disease.   Tr. 460.   The MRI identified a mild annular disc bulge at T11-12 and a lateral disc protrusion at L5-S1 resulting in moderate narrowing of the left neural foramen with potential associated

compromise of the left L5 nerve root.   Tr. 461.   Plaintiff was seen to have

bilateral facet joint hypertrophy at L3-4, L4-5, and L5-S1.   *Id.*   Plaintiff

began treatment at Archbold Primary Care on March 27, 2015   Tr. 550.

She reported chronic back pain aggravated by extension, flexion, and

standing.   *Id.*   In her April 2015 visit, she was diagnosed with lumbar pain

and numbness in her hand.   Tr. 548.   Plaintiff saw Dr. Kimberly Pickens

at Archbold Primary Care in May 2015 and was diagnosed with back pain

and radicular pain of left lower extremity.   Tr. 544.   On June 10, 2015,

Plaintiff was seen at Archbold Primary Care, and reported that her constant

back pain was aggravated by changing positions and daily activities.

Tr. 537.   On July 7, 2015, she was referred to physical therapy, and for a

neurosurgery consult.   Tr. 536.

Plaintiff saw Dr. Gerald Kadis at Archbold Neurosurgery Service on

July 28, 2015, and was diagnosed with extremity weakness, gait

disturbance, numbness, tingling in legs, back pain, and muscle weakness.

Tr. 559.   She was found not to be a good surgical candidate due to

obesity.   Tr. 558.   At a follow-up visit on October 30, 2015, Plaintiff

reported numbness and tingling in her hands, dropping objects, and

unsteadiness.   Tr. 562.   She was referred for nerve conduction studies in

both hands and she was found to have carpal tunnel syndrome on both sides and was prescribed splints for both hands, although a later office note referenced mild carpal tunnel syndrome on the right.    Tr. 570, 579.

On September 10 and 21, 2015, Plaintiff was seen by Dr. Shoklat, at the Southern Interventional Pain Center for constant back pain and some numbness in her left foot.    Tr. 507, 513.    Office notes indicated "Left L5 positive straight leg raising."    Tr. 510, 516.

In June 2016, Plaintiff saw Dr. Pickens at Archbold Primary Care, and reported worsening back pain aggravated by daily activities and numbness in her left foot.    Tr. 677.    The notes indicate "the context includes obesity". Tr. 677.    Plaintiff was diagnosed with chronic pain disorder, chronic left-sided low back pain, and neuropathy secondary to back pain.    Tr. 680. On July 29, 2016, Dr. Pickens again diagnosed low back pain and obesity, and indicated that the back pain would improve with weight loss.    Tr. 685. In her October 2016 visit, Plaintiff reported that she has not been able to exercise due to back pain.    Tr. 687.    Plaintiff was reported to be compliant in taking her medications.    *Id.*

Plaintiff was examined by Dr. Nicodemo Macri on July 20, 2016, who also prepared a medical source statement titled "Medical Opinion Re:

Ability to Do Work-Related Activities (Physical)."   Tr. 725, 720-24.

Dr. Macri diagnosed Plaintiff with lumbar degenerative disc disease, facet

hypertrophy of lumbar region, paresthesia into both hands and into the left

leg, bilateral carpal tunnel syndrome, mood disorder, chronic pain disorder,

and morbid obesity.   Tr. 728-29.   He assessed Plaintiff's work capacity

and concluded that she has "multiple disabling conditions that at this point

in time, in [his] opinion limit her from seeking any type of gainful

employment."   Tr. 729.   His medical opinion on Plaintiff's ability to work

concluded that Plaintiff could lift less than 10 pounds on an occasional or

frequent basis; could stand and walk less than 2 hours in a workday with

changing positions every ten minutes and walking around every 5 minutes

and walking for only 10 minutes at a time; could sit for about 2 hours in a

workday with changing positions every 20 minutes; rest, recline or lie down

4 to 5 times daily during the workday, all postural limitations due to lumbar

facet arthropathy, lumbar degenerative disc disease, and morbid obesity;

could occasionally manipulate with her hands and fingers due to bilateral

carpal tunnel syndrome; occasionally operate foot controls.[9]   Tr. 720-23.

---

[9] The ALJ did not find Plaintiff's documented carpal tunnel syndrome to be a
severe impairment, concluding that Dr. Gerald Kadis, who did a nerve conduction study,

Dr. Macri opined that Plaintiff would likely be absent from work more than four days a month and that she was compliant with treatment and was not malingering.   Tr. 723.

On November 6, 2016, Dr. Pickens, who treated Plaintiff since March 2015, agreed with Dr. Macri's opinion of Plaintiff's functional limitations. Tr. 718-19.   Plaintiff's medical records, including many examinations by Dr. Pickens and others, documented Plaintiff's chronic back pain, leg pain and numbness, carpal tunnel syndrome, and morbid obesity that resulted in or contributed to Plaintiff's postural and functional limitations.   In light of the records supporting the limitations opined by Dr. Macri and Dr. Pickens, which would prevent Plaintiff from full time work, the ALJ's reliance on Plaintiff's daily activities to discount Dr. Macri's and Dr. Pickens' opinions was not warranted.   The Eleventh Circuit recently explained:

> If the ALJ does not grant controlling weight to the treating physician's report, the ALJ must analyze the weight to give that opinion based on, inter alia: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much relevant

---

did not have a "neurological solution."   Tr. 19.   Plaintiff points out, however, that lack of a surgical solution does not mean the impairment did not impose any functional limitations.   ECF No. 15.   Dr. Macri opined that Plaintiff would be limited to only occasional manipulation, which is not inconsistent with the effects of carpal tunnel syndrome.   Tr. 721.   The jobs cited by the ALJ as still available to Plaintiff all require frequent handling and fingering.

evidence supports the opinion; (4) how consistent the opinion is
with the record; and (5) whether the physician is a specialist
making opinions about an area within his specialty. 20 C.F.R.
§ 404.1527(c)(2)-(6).    If the ALJ disregards or accords less
weight to the opinion of a treating physician, the ALJ must state
his reasons for doing so with particularity, and the failure to do
so is reversible error.   Lewis, 125 F.3d at 1440; Sharfarz, 825
F.2d at 279.   Without a statement to this effect, a reviewing
court cannot determine if the ultimate decision on the merits of
the claim is rational and supported by substantial evidence.
Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).
Further, we will not affirm the ALJ's determination of which
medical opinions to credit "simply because some rationale
might have supported the ALJ's conclusion."   Winschel v.
Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir.
2011) (quotation omitted).

Stewart v. Comm'r of Soc. Sec. Admin., 746 F. App'x 851, 855 (11th Cir.

2018) (unpublished).   Substantial evidence does not support the ALJ's

reasons for giving only little weight to the opinion of Dr. Pickens, which

agreed with the opinion of Dr. Macri.   As discussed above, those opinions

were not inconsistent with the record of Plaintiff's self-reported activities of

daily living.   The opinions were also not inconsistent with the medical

record as a whole, which documented the limiting effects of Plaintiff's

severe impairments, including her morbid obesity, on her ability to function.

Nor does substantial evidence support giving great weight to the

December 7, 2015, opinion of Agency reviewing physician, Dr. Kline, who

did not examine Plaintiff.   The ALJ noted Dr. Kline's "Physical Residual

Functional Capacity Assessment" in which he opined that Plaintiff could lift

and/or carry 25 pounds occasionally and 10 pounds frequently; stand

and/or walk for about 6 hours in a workday; sit for about 6 hours in a

workday; occasionally stoop, kneel, crouch, climb ramps and stairs; and

never climb ladders, ropes, and scaffolds.   Tr. 28 (citing Tr. 103-05).   The

records reviewed by Dr. Kline reported Plaintiff's weight at the time was

295 pounds.   Tr. 105.   The ALJ explained giving great weight to

Dr. Kline's opinion by noting that it is consistent with "the medical evidence

as a whole" even though the records available to him did not comprise the

medical record as a whole, and essentially assumed that Dr. Kline would

adhere to the same opinion if he had the entire medical record, including

for 2016.

The medical records for 2016 showed that Plaintiff's weight increased

greatly due in significant part to the limitations on her activity imposed by

her back pain.   Records from Plaintiff's June 27, 2016, visit to Dr. Pickens

disclosed that Plaintiff's back pain was worsening and was relieved by lying

down.   Tr. 677, 679.   She was experiencing radiated pain to her left foot

and was diagnosed with neuropathy secondary to back pain and

gabapentin was restarted.   Tr. 680.   She was referred to pain

management and a sleep study.   Tr. 680.   Plaintiff's weight had increased

to 299 pounds.   Tr. 679.   On July 29, 2016, Dr. Pickens' office notes

indicate Plaintiff was still experiencing back pain that she reported

precluded her from exercising.   Tr. 682.   In October 2016, Dr. Pickens'

notes indicate Plaintiff's weight had increased to 310 pounds and she had

hypertension of which "back pain [was] part of etiology."   Tr. 690.

In August 2016, Plaintiff was seen by Venu Madhipatla, M.D., who

found Plaintiff with obvious distress due to back pain, decreased range of

motion, straight leg raising positive on the left, and decreased sensory

touch in L3-4, L4-5, and L5-S1.   Tr. 736.   In September 2016, Dr.

Madhipatla found Plaintiff with left lumbar facet tenderness, moderate to

severe, bilateral lumbar paraspinal muscle spasms greater on the left,

decreased range of motion in all planes, and left S1 joint tenderness.   Tr.

734.   He noted Plaintiff was doing home exercise physical therapy and he

scheduled her for facet joint injections when approved.   *Id.*

The opinion of Agency reviewer, Dr. Kline, was based on records that

did not include an entire year of Plaintiff's evaluation and treatment.

Further, Dr. Kline opined that the records showed Plaintiff had no pain with

straight leg raise even though on September 10 and 21, 2015, Plaintiff was seen by Dr. Shoklat, at the Southern Interventional Pain Center for constant back pain and some numbness in her left foot.   Tr. 507, 513. Office notes indicated "Left L5 positive straight leg raising."   Tr. 510, 516. Substantial evidence does not support the ALJ's assignment of great weight to Dr. Kline's opinion.

Although not proof of disability commencing prior to the date last insured, medical records made after the date last insured can be relevant if they show the trend and continuity of Plaintiff's impairments and functional limitations that were present prior to the date last insured.   *See* Putman v. Soc. Sec. Admin., Comm'r, 705 F. App'x 929, 935 (11th Cir. 2017) (unpublished); *see also* Gold v. Sec'y of Health, Education and Welfare, 463 F.2d 38, 42 (2d Cir. 1968) (holding in part that evidence subsequent to date the earning requirement was met "may disclose the severity and continuity of impairments existing before the earning requirement date") (quoting Carnevale v. Gardner, 393 F.2d 889, 890 (2d Cir. 1968)).   In the present case, on February 15, 2017, Plaintiff reported to Colquitt Regional Anesthesia for left facet injections for her continuing back pain.   Tr. 752. She was assessed with back muscle spasm, lumbar facet joint pain,

sacroiliac joint pain, and left hip pain.   Tr. 752-53.   Her weight on that

date was 320 pounds.   *Id.*   Plaintiff saw Dr. Pickens on March 3, 2017,

and at that time Plaintiff weighed 335 pounds.   Tr. 763.   These records

show the continuity of Plaintiff's physical impairments and the increasing

severity of Plaintiff's obesity.

Plaintiff also contends that the ALJ failed to explain how Plaintiff's

obesity in combination with her other impairments limits her ability to

function.   ECF No. 15 at 23-24.   The ALJ found that Plaintiff's morbid

obesity is a severe impairment and noted that in March 2015, Plaintiff

weighed 312.3 pounds, which corresponds to a BMI of 51.97 considering

Plaintiff's height.[10]   Tr. 27 (citing Tr. 550).   As discussed above, her

weight was 335 pounds two years later, equating to a BMI of 55.7.

The ALJ did not fail to mention Plaintiff's obesity.   He noted that

Plaintiff reported that her difficulty with daily activities was mostly due to her

weight.   Tr. 24.   The ALJ noted Plaintiff was found to be markedly

---

[10]   At 312 pounds, Plaintiff's BMI was reported to be 51.6.   Tr. 752.   A BMI of 40
or higher is categorized as Class 3 Obesity, which is sometimes referred to as
"extreme" or "severe" obesity.   *See* https://www.cdc.gov/obesity/adult/defining.html.
Plaintiff's physicians referred to her obesity as "morbid obesity."   "Extreme obesity"
represents "the greatest risk for developing obesity-related impairments."   SSR 02-1p,
Evaluation of Obesity (September 12, 2002), 2002 WL 34686281, at *2.

overweight by Dr. Kadis.   Tr. 26.   The ALJ noted that Dr. Pickens advised

Plaintiff that her back pain would improve with weight loss.   Tr. 26, 29.   In

explaining why the ALJ gave great weight to the opinion of the Agency

reviewer, Dr. Kline, the ALJ referred to Plaintiff's "moderate back pain with

neuropathy that is complicated by morbid obesity."   Tr. 28.   Finally, the

ALJ explained that at each step of the sequential evaluation proves, the

undersigned has specifically considered the effects of claimant's obesity

under SSR 02-1p in formulating Plaintiff's RFC.   Tr. 27.   However, the

ALJ did not explain how he considered those effects beyond essentially

reciting the references to obesity in the medical records.

Social Security Ruling 02-1p, 2002 SSR LEXIS 1 (Sept. 12, 2002),

guides the evaluation of obesity in disability claims, and was published

following the deletion of Listing 9.09, Obesity, from the Listing of

Impairments.   2002 SSR LEXIS 1, at *1–2.   Social Security Ruling 02-1p

recognizes that obesity is a risk factor that increases the chance of

developing impairments in other body systems, including the

cardiovascular, respiratory, and musculoskeletal body systems.   *Id.* at *6.

Social Security Ruling 02-1p also provides guidance when evaluating

obesity in assessing an RFC.   *Id.* at *16-19.   It is noted, in part, that

[o]besity can cause limitation of function.   The functions likely to be limited depend on many factors, including where the excess weight is carried.   An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.   It may also affect the ability to do postural functions, such as climbing, balance, stooping, and crouching.   The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers.   The ability to tolerate extreme heat, humidity, or hazards may also be affected. . . .

**An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.**   Individuals with obesity may have problems with the ability to sustain a function over time.   As explained in SSR 96–8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), **our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.   A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.**   In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.   This may be particularly true in cases involving sleep apnea.

The combined effects of obesity with other impairments may be greater than might be expected without obesity.   For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* at *16-17 (emphasis added).   Ruling 02-1p also states that, "[a]s with any other impairment, we will explain <u>how</u> we reached our conclusions on whether obesity caused any physical or mental limitations."   SSR 02-01p,

at *7 (emphasis added).   Given the Commissioner's general "duty of explanation," it is assumed that an ALJ must likewise explain the basis for his conclusions regarding obesity.   *See, e.g.*, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir.1985) (per curiam) (stating that an ALJ has a "duty of explanation" of what informed his decision).   "The duty of explanation will be satisfied when the ALJ presents 'us with findings and determinations sufficiently articulated to permit meaningful judicial review,' which must include specific reference to the evidence producing his conclusion." Wyatt v. Bowen, 887 F.2d 1082, at *4 (4th Cir. 1989) (table) (citing DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983)); Hammond*,* 765 F.2d at 426); Jones v. Berryhill, No. CV118-010, 2019 WL 922255, at *6 (S.D. Ga. Jan. 28, 2019) ("[T]he ALJ was required to consider all of Plaintiff's impairments when determining her RFC, including her well-documented obesity, and explain his conclusions.   *See* 20 CFR §§ 404.1520(e), 404.1545; SSR 96-8p, at *5; SSR 02-1p, at *7."), *report and recommendation adopte*d, No. CV118-010, 2019 WL 919007 (S.D. Ga. Feb. 25, 2019).

The ALJ's references to morbid obesity, recognizing its existence, and the broad conclusion that it had been considered at every step, fails to

apprise the Court of the basis for concluding that Plaintiff's morbid obesity, when considered in combination with her spinal degeneration and neuropathy, did not prevent her from working full time and sitting and standing for up to six hours in a workday.   Thus, meaningful review of this aspect of Plaintiff's functional capacity analysis is hindered.

Moreover, the ALJ's reliance on Plaintiff's "noncompliance" with recommendations that she lose weight as a reason to find that her asserted physical limitations were not consistent with the medical record was not warranted.   *See* Tr. 27.   The ALJ stated, "inconsistent reports and testimony from the claimant, and the fact that the record contains observations of generally stable examination findings, with noted improvement when compliant with medical instruction and **non-compliance with advised weight loss**, as well as good activities of daily living . . . detracts from the consistency of the claimant's statements as to functional limitations and severity of her alleged symptoms."   Tr. 27 (emphasis added).   Non-compliance with prescribed treatment regimens without good cause will result in the denial of disability benefits applications.   *See* 20 C.F.R. § 416.930.

> However, the [ALJ] must not draw any inference about an individual's symptoms and their functional effect from a failure to seek or pursue regular medical treatment **without first considering any explanations that the individual may provide**, or other information in the case record, that may explain [the individual's noncompliance].

Weary v. Comm'r of Soc. Sec., No. 6:14-cv-1742-ORL-GJK, 2016 WL 1030800, at *2-3 (M.D. Fla. Mar. 15, 2016) (emphasis added) (citing SSR 96-7p, 1996 WL 374186, at * 7 (1996)).   With respect to obesity and a claimant's failure to follow recommendations to lose weight, the Eleventh Circuit has explained:

> A physician's recommendation to lose weight does not necessarily constitute a prescribed course of treatment, nor does a claimant's failure to accomplish the recommended change constitute a refusal to undertake such treatment. Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).   [Claimant's] obesity, of itself, does not justify the conclusion that she has refused treatment nor the consequent denial of disability benefits.   *See* Johnson, 794 F.2d at 1113 ("it is impermissible . . . to presume that obesity can be remedied."); Stone v. Harris, 657 F.2d 210, 212 (8th Cir. 1981).   Further findings of fact and conclusions of law are required before the Secretary may determine that a claimant has refused treatment.   *See* Scott v. Heckler, 770 F.2d 482, 486 (5th Cir. 1985).

McCall v. Bowen, 846 F.2d 1317, 1319 (11th Cir. 1988).   The ALJ "may not rely simply upon the fact of a claimant's obesity and a prior medical

recommendation that the claimant lose weight in order to find that the claimant has failed to comply with prescribed treatment."   Ramsey v. Comm'r of Soc. Sec., No. 6:09-cv-1664-Orl-18DAB, 2010 WL 5209321, at *4 (M.D. Fla. Nov. 22, 2010).   "Rather, evidence must be presented suggesting that [the claimant] has refused to follow a plan of prescribed treatment."   *Id.* at *4 (emphasis added).   "Furthermore, there must be evidence that, had the claimant 'followed the [prescribed treatment to lose weight], his ability to work would be restored.' "   *Id.* (quoting Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

As noted above, the ALJ in the present case cited non-compliance with advice to lose weight and to exercise, stating in part that Plaintiff "continued to not participate in any exercise regimen" and was not exercising.   Tr. 26 (citing Tr. 682, 687).   The medical records relied on by the ALJ, however, indicate that Plaintiff reported to her physician that she "continues to not be participating in any exercise regimen **due to back pain**."   Tr. 682, 687 (emphasis added).   She also testified at the hearing that she "just can't physically do what [she] used to do or move."   Tr. 55. Thus, Plaintiff did explain that her back pain was a major factor in what the ALJ characterized as "non-compliance" and which the ALJ cited, in part, to

justify finding Plaintiff's reports of her physical limitations inconsistent with the severity of her symptoms.   Tr. 27.   The ALJ's reliance on Plaintiff's failure to exercise and failure to lose weight was not warranted and did not provide substantial evidence for giving less credence to Plaintiff's statements concerning her physical limitations.   Further, Ruling SSR 02-1p does not provide a basis for the Commissioner or the ALJ to discount the effects of obesity based on failure to lose weight as advised by physicians. Rather, the ruling expressly recognized that "obesity is a complex, chronic disease" for which treatment is "often unsuccessful."   *Id.* at *2,

In sum, substantial evidence does not support the ALJ's decision to give little weight to the opinions of Dr. Pickens and Dr. Macri and to give great weight to Agency reviewer Dr. Kline.   The ALJ also erred in relying on Plaintiff's activities of daily living to discount Plaintiff's reports of her functional limitations and to discount the opinions of Dr. Pickens and Dr. Macri.   The ALJ further erred in failing to explain in detail sufficient for judicial review, how Plaintiff's obesity, when considered in combination with her other impairments, affected her residual functional capacity.   Finally, the ALJ erred in discounting Plaintiff's statements of functional limitations based in part on a finding that she was non-compliant with advised weight

loss.   For these reasons, discussed in more detail above, the case should be remanded for further consideration of the effects of Plaintiff's physical impairments on her functional capacity.

### 2. Mental Limitations Resulting From Severe Impairments

It is also not in dispute that Plaintiff has the severe mental impairments of borderline personality disorder; borderline intellectual functioning; affective disorder variously diagnosed as major depressive disorder and mood disorder; anxiety disorder variously diagnosed as generalized anxiety disorder and panic disorder with agoraphobia.   Tr. 18. However, Plaintiff contends that the ALJ erred in discounting the opinions of Karl Willers, Ph.D., and Joseph Garmon, Ph.D., concerning Plaintiff's mental limitations as they affect her ability to function outside the home. ECF No. 15 at 14.

Dr. Willers evaluated Plaintiff for a disability determination in August 2015 and reviewed her progress notes from treatment at Behavioral health Services of South Georgia.   Tr. 587.   He administered IQ and achievement tests and found that Plaintiff has a full-scale IQ of 75, which reflects borderline intellectual functioning.   Tr. 747.   Dr. Willers diagnosed Plaintiff with major recurrent depression, moderate to severe; borderline

personality disorder, and obesity.   Tr. 491.   He opined that she could

function in a basic domestic routine but not outside of that.   Tr. 492.

Dr. Willers saw Plaintiff in February 2017 and found her with significant

depression, severe persistent dysphoria, and morbidly obesity.   Tr. 745.

He concluded she was significantly limited in her adaptive functioning

outside the confines of her residence due to her depression and severely

limiting social anxiety.   Tr. 747-748.   He noted, after a review of her

longitudinal record, that her depression and severely limiting social anxiety

spanned six years, and the chronicity of her social anxiety and major

depression was noted as far back as middle school when she withdrew

from the school setting after prolonged absences.   Tr. 748.   Dr. Willers

opined that Plaintiff would miss more than four days of work per month.

Tr. 750.

　　　Dr. Garmon began treating Plaintiff in December 2015 for depression

and anxiety.   He saw Plaintiff in January and February 2016 and

diagnosed Plaintiff severe, recurrent major depressive disorder and

generalized anxiety disorder.   Tr. 616-617.   In July 2016, Dr. Garmon

found Plaintiff had marked limitations in her ability to maintain social

functioning and concentration, persistence, or pace.   Tr. 655.   He also

opined she would miss work more than four days a month.   Tr. 659.

In light of the recommendation for remand to reconsider findings as to

Plaintiff's physical limitations, and to explain how Plaintiff's obesity in

combination with her other severe physical impairments affects her ability

to function, it is unnecessary to reach the issue of the ALJ's determinations

concerning Plaintiff's severe mental impairments.   However, this

recommendation does not express any opinion on the validity of the ALJ's

decision as to how Plaintiff's mental impairments affect her residual

functional capacity.

## IV. Conclusion

For the reasons set forth above and considering the record as a

whole, the Commissioner's findings of fact and determinations are not

based upon substantial evidence in the record as a whole and the ALJ

incorrectly applied the law.   The decision should not be affirmed.

Accordingly, it is respectfully **RECOMMENDED** pursuant to sentence four

of 41 U.S.C. § 405(g), that the decision of the Commissioner to deny

Plaintiff's application for Social Security benefits be **REVERSED** and the

Commissioner be ordered to **REMAND** this case for further proceedings

Case No. 4:18cv415-WS/CAS

consistent with this Report and Recommendation; and that the Clerk be

**DIRECTED** to enter judgment for the Plaintiff and close the file.

**IN CHAMBERS** at Tallahassee, Florida, on May 8, 2019.


s/ Charles A. Stampelos_____
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Fed. R. Civ. P. 72(b)(2).   Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.